Filed 8/20/25  In re Allen B. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re ALLEN B., a Person Coming Under the Juvenile Court Law. | B338857 (Los Angeles County Super. Ct. No. 24CCJP01166) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LUIS B.,<br><br>    Defendant and Appellant. | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING<br><br>NO CHANGE IN JUDGMENT |

On the court's own motion and good cause appearing,

IT IS HEREBY ORDERED that the opinion filed herein on July 30, 2025, be modified as follows:

The last full paragraph on page 12, beginning with the word "Finally" and ending with the word "license," is deleted.

The modification does not affect the judgment.

Appellant's petition for rehearing is denied.

LUI, P. J.          ASHMANN-GERST, J.          CHAVEZ, J.

Filed 7/30/25 In re Allen B. CA2/2 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| In re ALLEN B., a Person Coming Under the Juvenile Court Law. | B338857 (Los Angeles County Super. Ct. No. 24CCJP01166) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. LUIS B., Defendant and Appellant. | |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Affirmed.

Nicole Kronberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jacklyn K. Louie, Deputy County Counsel, for Plaintiff and Respondent.

Luis B. (father) appeals from a juvenile court judgment ordering informal supervision of his child Allen B. (born February 2024) under Welfare and Institutions Code[1] section 360, subdivision (b).[2] Father argues the evidence was insufficient to support the juvenile court's findings under section 300, subdivision (b) that father failed to protect Allen or that Allen was at risk at the time of the jurisdictional hearing. Viewing the record in the light most favorable to the juvenile court's decision, we find substantial evidence in the record supports the decision, we therefore affirm the judgment.[3]

## FACTUAL AND PROCEDURAL BACKGROUND
**Referral**

In February 2024, the Los Angeles County Department of Children and Family Services (DCFS) received an immediate response referral from a mandated reporter stating father and Sonia U. (mother) brought three day-old Allen to the emergency

---

[1]    All further undesignated statutory references are to the Welfare and Institutions Code.

[2]    Section 360, subdivision (b) provides, "If the court finds that the child is a person described by Section 300, it may, without adjudicating the child a dependent child of the court, order that services be provided to keep the family together and place the child and the child's parent or guardian under the supervision of the social worker for a time period consistent with Section 301."

[3]    The order of a juvenile court for informal supervision under section 360, subdivision (b) is a disposition order. In dependency proceedings, it is a final judgment and thus an appealable order. (*In re Adam D.* (2010) 183 Cal.App.4th 1250, 1261.)

room.[4]  The parents reported being sleep-deprived, and father accidentally mixed Mezcal into the baby's formula.

Father reported mother was concerned she was not producing enough breast milk, prompting them to buy formula. On the day of the referral, at 11:00 a.m., father made a bottle for the child, explaining there were two water bottles on the kitchen table, both of which had no labels.  One of the bottles contained Mezcal.  Father did not know how the bottle ended up on the table.  Father expressed having been so tired he did not even notice he poured from the wrong bottle.  He gave the bottle to mother to feed the child.  Shortly thereafter, the child spit out the milk, and the parents opened the bottle and smelled it.  It was then the parents realized father poured from the Mezcal bottle instead of the water bottle.  The parents immediately took the baby to the hospital.  Father denied being intoxicated.

The baby's toxicology report showed he had an ethanol alcohol level of 56 milligrams per deciliter.  The normal range is less than 13 milligrams.  Both parents were visibly worried.

During risk assessment, mother disclosed use of marijuana. The last time she used marijuana was one year before pregnancy. Father reported a history of methamphetamine use.  The last time he used methamphetamine was five years earlier.  Father also reported having another child and a history with DCFS.

**Investigation**

The social worker interviewed mother at the home where she lived with maternal grandparents on February 23, 2024. Mother said she and father were romantically involved for over a year.  She denied having a criminal history.  Mother worked fulltime as a campus aide at an elementary school.  Mother

---

[4]     Mother is not a party to this appeal.

denied using or having a history of drug or alcohol use, and was willing to test.

Regarding the incident, mother reported father made the baby a bottle of formula, and there were multiple water bottles on the table. Father grabbed one of the bottles and was unaware it contained Mezcal. After a couple of minutes of feeding the baby, the baby was spitting up and there was an odor of alcohol. Father opened the baby bottle, smelled it, and realized he used the bottle that contained Mezcal rather than water. When the parents realized the bottle had been made with Mezcal instead of water, they immediately rushed the baby to the hospital emergency room. Once the alcohol was completely out of the infant's system, he was cleared to go home. A few days later, the parents took the baby to a follow-up appointment with his pediatrician. Mother stated the water bottle containing Mezcal was left over from her baby shower and was mixed up with other water bottles that were in her room on the table.

The baby was doing well and had another follow-up appointment on March 11, 2024. The previous social worker provided mother with referrals for parenting classes, which she and father planned to join. Mother was quite worried when the incident occurred, crying and being emotional at the hospital and for a few days after the incident. Mother and father were remorseful about the baby having accidentally ingested liquor and were willing to do anything DCFS asked of them, as they did not want the baby removed from their home.

The social worker observed mother to be attentive to Allen's needs and observed no safety issues. The social worker did not observe any marks or bruises on the child's body.

The social worker spoke with father on March 21, 2024, regarding a record of driving under the influence of alcohol or

4

drugs (DUI), reckless driving and possession of an open container of alcohol in San Bernardino County from February 2022.  Father claimed someone must have used his identity and denied having a DUI or having been in San Bernardino County.  Father intended to go to the police department to clear the error.  Father admitted to using methamphetamines when he was younger but stated he had changed his life and no longer uses such substances.  He admitted previous criminal convictions, however, not for DUI.  Father said he drinks once in awhile at social events but never to the point of intoxication.

Father reported mother and baby were discharged following Allen's birth.  Mother was breastfeeding and was not producing enough milk.  They returned to the hospital to see if they could get formula but were denied because they had already been discharged.  They left the hospital around 2:00 a.m. and found an open drug store where they purchased formula for the baby.  When they arrived home, they made a bottle for the baby and went to sleep.  When the baby woke up for his next feeding, father, who stated he was half asleep, got up to prepare the baby's bottle.  There were multiple water bottles on the table.  He grabbed one that was half empty to make the baby's bottle.  Mother was trying to feed the baby who would not take the bottle.  Then father tried.  The baby threw up on father, and the odor of alcohol prompted father to open the bottle and realize his mistake of making the bottle with Mezcal instead of water.  He and mother immediately took the baby to the hospital.

Father said he and mother were sleep deprived and it was an honest mistake.  The water bottle containing alcohol was left in the bedroom after a baby shower.  The bottle was sitting behind the television on a stand.  When relatives cleaned the

room, they were unaware the bottle contained alcohol and moved it to the table with the other water bottles.

Father and mother had attended parenting classes and had not missed any classes. They would receive certificates upon completion of the 12-week program. Father and mother were willing to comply with DCFS's recommendations. They did not want the baby removed.

At follow-up interviews on April 8 and 10, 2024, father said he did not have a driver's license until March 25, 2024. He obtained his Department of Motor Vehicles record, which did not reveal any DUI. He then went to the police department and was told nothing showed on his driving record, but they suggested father go to the California Highway Patrol (CHP) for more information. Father went to CHP, and nothing showed on their database. A CHP officer offered it was not uncommon for there to be a mix-up because father's driver license contained a number seven, which is often mistaken for a number one. The CHP in San Bernardino also had no record of father having a DUI and suggested he go to the court for paperwork. At the San Bernardino Superior Court, father was informed there was no record of him having a DUI and issued him a "Certification Of No Record." Father provided the social worker the certificate and a copy of his driver's license.

The medical clerk at White Memorial Hospital reported the baby had a follow-up appointment for alcohol ingestion on February 20, 2024, at which time the baby was asymptomatic and doing well. Safety precautions were discussed with the parents. The social worker also spoke with two staff members at Project Impact, where the parents had enrolled in weekly parenting classes. The parents were attending regularly and would receive a certificate after their last class.

6

Mother had no prior DCFS history. Father was the alleged perpetrator in a 2017 child welfare investigation concerning his older child Luis. The reporting party said father and his girlfriend fought constantly with the child present. Law enforcement had been to the home three times in the prior month. The child could be heard crying and was often left inside the home while father was outside with friends. It was believed father sold drugs from the home. The referral was closed as inconclusive.

**Petition and initial hearing**

DCFS filed a section 300 petition on behalf of Allen on April 15, 2024. The petition alleged a single count under section 300, subdivision (b), that the parents "placed the child in a detrimental and endangering situation in that the child ingested alcohol. On or about 2/10/24, the father mixed tequila with the baby formula in the child's bottle, resulting in the child ingesting alcohol. The child tested positive for alcohol and required medical treatment. The detrimental and endangering situation established for the child by the parents endangers the child's physical health and safety, creates a detrimental home environment, and places the child at risk of serious physical harm, damage, and danger."

At the initial hearing on April 29, 2024, DCFS provided the mother's and father's drug and alcohol tests taken on March 16 and 23, respectively. Both were negative. The juvenile court found DCFS had set forth prima facie evidence that the child was described by section 300 and ordered the child released to the parents under DCFS's supervision. The court ordered father to provide two clean, consecutive random drug tests and for the mother to drug test on reasonable suspicion. DCFS was ordered to provide the parents with low or no-cost referrals and to

evaluate for a section 301 contract or section 360, subdivision (b) voluntary resolution.

**Jurisdiction/disposition report**

DCFS submitted its jurisdiction/disposition report on June 10, 2024.

Due to the prior referral of father's older child, paternal aunt Ana S. became that child's legal guardian through family law court in January 2018. Luis remained with the paternal aunt, and father had occasional contact with the child.

Father had a criminal history from 2013 through 2022, which included a conviction for possession of a controlled substance, car theft, domestic violence, and battery.

In interviews with the dependency investigator, mother and father repeated their previous statements about the incident. Mother provided additional information about how the Mezcal ended up in a water bottle, stating, "The alcohol was in our room because we had a baby shower and it was a little tequila left and not enough to leave in a big bottle so it was poured into the water bottle. I know better now. . . . It was an honest mistake that we both regret." Father expressed it was his fault.

On May 22, 2024, the program administrator at Project Impact reported the parents had been actively participating and attending the 12-week parenting class via Zoom. The parents had been told to sign a release of information so a report could be provided to DCFS. In addition, mother needed to sign a release of information so the social worker could speak with the staff at White Memorial Hospital.

Father drug tested three times: March 16, 2024, he was turned away because he did not have proper identification. March 25, 2024, he drug tested negative. May 24, 2024, his sample returned "Cancel Rejected Fatal Flaw No Sample."

Mother had not drug tested because there was no reason to suspect she was under the influence.

Father said he last used methamphetamine five years ago. He was "not in a good place" at the time and admitted domestic violence with the mother of his older child, for which he was incarcerated. While he was in jail, the mother of his older child left the child with the paternal aunt and never came back. Father said he was now a better man.

DCFS reported the parents had been properly caring for the baby and were willing to participate in programs. The parents shared a loving attachment to the baby, who was comfortable with them. The baby was socially and emotionally on target, and the parents had family support. The maternal grandparents allow the parents to live in their home and permit paternal grandmother to come to the home daily to babysit while the parents were working. However, given the severity of the circumstances and the baby's very young age, DCFS recommended the court take jurisdiction of the child while family maintenance services were provided.

**Jurisdiction hearing**

The adjudication took place on June 10, 2024. DCFS had amended the petition to strike mother from the petition. The court received into evidence DCFS's reports with attachments. The court then heard argument from father's counsel, who asked the petition to be dismissed, and DCFS's counsel, who asked the petition to be sustained.

Following argument, the court found count b-1 true as to father. The court noted, "[T]his is a close one." The court felt there were some concerning things in father's history, but stated, "if he continues to do the parenting classes and drug testing as suggested by [DCFS], in six months the case should go away on

9

its own."  The court ordered a dispositional plan pursuant to section 360, subdivision (b).  The court made its decision over the objections of father and DCFS.

The court ordered DCFS and the parents to meet and develop a case plan under section 360, subdivision (b).

On June 20, 2024, father filed his notice of appeal.

## DISCUSSION

Father challenges the juvenile court's decision to sustain the allegations under section 300, subdivision (b).  He asserts insufficient evidence existed to support the court's finding.

## I.     Applicable law and standard of review

To sustain a jurisdictional finding under section 300, subdivision (b)(1), the trial court must find that a child has suffered, or is at substantial risk of suffering, serious physical harm or illness due to a parent's (1) failure or inability to adequately supervise or protect the child; (2) failure to adequately supervise or protect the child from the conduct of a custodian; (3) failure to provide the child with adequate food, clothing, shelter, or medical treatment; or (4) inability to provide care due to mental illness, developmental disability, or substance abuse.  DCFS must prove a failure or inability to protect the child; causation; and serious physical harm or illness to the minor, or a substantial risk of such harm or illness.  (*In re R.T.* (2017) 3 Cal.5th 622, 628–629.)

In assessing whether there is a substantial risk of serious physical harm or illness to the minor, the juvenile court looks to whether such a risk is apparent at the time of the jurisdictional hearing.  (*In re Cole L.* (2021) 70 Cal.App.5th 591, 607.)  "'Thus the past infliction of physical harm by a caretaker, standing alone, does not establish a substantial risk of physical harm;

10

"[t]here must be some reason to believe the acts may continue in the future.""" (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1023.) In assessing risk based on a single incident, the court should consider "the nature of the conduct and all surrounding circumstances." (*Id.* at p. 1025.) "'The court need not wait until a child is seriously abused or injured to . . . take the steps necessary to protect the child.'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

We review the juvenile court's jurisdictional findings for substantial evidence in light of the whole record. (*In re I.C.* (2018) 4 Cal.5th 869, 892.) Under this standard, we are not permitted to "evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts." (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 947.) We must "draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion." (*Ibid.*)

## II.   Substantial evidence supports the juvenile court's finding under section 300, subdivision (b)(1)

Father argues the evidence did not support the juvenile court's decision to sustain the allegations concerning the bottle feeding incident. Father asserts the incident was purely accidental, and there was an absence of evidence that, at the time of the jurisdictional hearing four months later, Allen was at substantial risk of suffering serious physical harm or illness. Thus, father contends, the juvenile court's finding that Allen was a child described by section 300, subdivision (b)(1), was not warranted.

The facts regarding father's act of putting Mezcal in the newborn's bottle are undisputed. Father insists this was a one-

11

time incident and Allen was not at risk of future harm. However, in determining whether the evidence supports the juvenile court's decision, we must look at the record as a whole. (*In re I.C., supra*, 4 Cal.5th at p. 892.) Father admitted to using methamphetamine in the past. He also had a criminal record, which included possession of a controlled substance and domestic violence, for which he was incarcerated. Father had a child welfare history and did not have custody of his older child.

Significantly, at the initial hearing on April 29, 2024, father was ordered to produce two consecutive clean drug tests. At the time of the June 10, 2024 adjudication, father had not done so. Father tested negative once. On another occasion, he was turned away because he did not have proper identification, and a third drug test was rejected due to "Fatal Flaw No Sample." The juvenile court was entitled to consider father's failure to provide two consecutive clean drug tests, as ordered.

In addition, while the parents were regularly attending parenting classes, they had not completed the program at the time of the adjudication hearing. Nor had the parents signed a release of information that would have allowed DCFS to gather information about their progress.

Finally, there remained questions about the DUI on father's record from February 2022. Father denied ever having received a DUI, insisting someone must have been using his identification. When the social worker first asked father about this on March 21, 2024, father denied the charge but did not deny having a driver's license. Later, in April 2024, father said he had just obtained his driver's license on March 25, 2024. Father never explained how someone could have used his identification prior to his obtaining a driver's license.

The juvenile court noted there were concerning aspects of father's history at the time it sustained the allegation under section 300, subdivision (b)(1).  In reviewing the evidence before the juvenile court, we must draw all reasonable inferences in support of the findings and consider the record most favorably to the juvenile court's order.  (*In re L. Y. L., supra,* 101 Cal.App.4th at p. 947.)  Although evidence in the record also supports a contrary conclusion, sufficient evidence supports the juvenile court's determination that Allen was at substantial risk of serious harm at the time of the adjudication hearing without informal supervision from DCFS.

III.   **The cases cited by father are distinguishable**

Father cites several cases in support of his position that the juvenile court erred.  All are distinguishable.  In *In re J.N., supra*, 181 Cal.App.4th 1010, a petition was filed following an isolated incident.  The father was driving under the influence of alcohol with the mother and their three minor children in the car.  The father struck another vehicle before losing control of the vehicle and crashing into a traffic signal pole.  (*Id.* at pp. 1015–1017.)  The father attempted to flee the scene with one of the children, and both parents were agitated and uncooperative.  Both also appeared under the influence of alcohol.  (*Ibid.*)  The *J.N.* court reversed the juvenile court's finding of jurisdiction on the ground that there was no current risk to the children.  (*Id.* at p. 1026.)  The appellate court emphasized it was necessary to consider all surrounding circumstances, including "evidence of the parents' current understanding of and attitude toward the past conduct that endangered a child, or participation in educational programs, or other steps taken, by the parent to address the problematic conduct in the interim, and probationary support and supervision already being provided through the

13

criminal courts that would help a parent avoid a recurrence of such an incident." (*Id.* at pp. 1025–1026.) The mother remained under probation supervision at the time of the hearing, and was required by the criminal court to complete substance abuse and parenting programs. The father was incarcerated. In addition, there was no evidence either parent had a substance abuse problem. (*Ibid.*)

The matter before us is different. Neither parent is under the supervision of the criminal court, and father has a possible history of substance abuse. In addition, at the time of the adjudication hearing, father had failed to provide two consecutive clean drug tests. Under these circumstances, the juvenile court could properly find a current risk of harm.

In *In re Gilberto G.* (2024) 105 Cal.App.5th 52, 55, the mother "had too many beers and injured her leg when she fell on a bus while she was taking her three children to see their father." The juvenile court sustained a petition and placed the family under the supervision of DCFS pursuant to section 360, subdivision (b). Under those circumstances, the *Gilberto G.* court found substantial evidence did not demonstrate a substantial risk the mother's failure or inability to supervise or protect her children would recur. (*Gilberto G.*, at p. 66.) Notably, the "single incident of intoxication in this case did not result in harm to the children, and there [was] no evidence they were at risk of serious physical harm while riding the bus with their mother to meet their father." (*Id.* at p. 65.) The children in the *Gilberto G.* matter were aged 10, eight, and six. (*Id.* at p. 55.) Here, in contrast, Allen was a newborn when father put alcohol in his bottle. Allen was extremely vulnerable and was harmed by father's actions. Again, father had not provided two consecutive negative drug tests, and had not completed parenting classes, at

14

the time of the adjudication hearing. These facts differentiate the case before us from *Gilberto G.*

Father also argues he took proper actions following the incident, thus demonstrating he did not neglectfully fail to supervise or protect Allen. Father cites *In re Jonathan B.* (2015) 235 Cal.App.4th 115 in support of his argument. In *Jonathan B.*, the mother argued she should be stricken from the petition alleging domestic violence because she drove straight to the police station following the incident and obtained a restraining order against the father. Mother was not the perpetrator of the violence. The appellate court reversed the juvenile court's findings against mother because there was no evidence she would nonaccidentally expose her children to father's violence or fail to protect them from it. (*Id.* at pp. 119–120.) Here, father was the perpetrator of the event causing newborn Allen to ingest alcohol. While the evidence shows it was accidental, there is also evidence of father's substance use, and his failure to provide two consecutive clean drug tests. While his actions of taking Allen to the emergency room immediately are commendable, the evidence supports the supervision order imposed by the juvenile court in this matter.

Father asserts the juvenile court improperly relied on his past struggles with substance abuse and criminal history. Father cites *In re Emily L.* (2021) 73 Cal.App.5th 1, 15, for the proposition that "[w]hile evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances at the time of the hearing subject the child to the defined risk of harm." In *Emily L.*, the family came to the attention of social services because the minor and the mother got into a physical altercation. The minor was a teenager who was out of control, acting out and skipping school. "By the

time of the hearing in Emily's case, familial circumstances had undergone epic changes.  Simply put, Emily had turned her life around.  As of December 1, 2020, there was no evidence Emily was still quick to anger, prone to violence, smoking marijuana, ditching school, staying out overnight without permission, or disrespecting her parents and their rules.  Rather, Emily was attending school, getting good grades, making up her class credits, communicating with and respecting the home rules of her two parents, turning in homework assignments, and, importantly, not fighting verbally or physically with her family members, including her mother." (*Id.* at pp. 15–16.)  The *Emily L.* court noted the juvenile court must have "recognized yet glossed over the absence of risk of future harm" given Emily's transformation.  (*Id.* at p. 16.)

Father argues similarly, between the bottle-feeding incident in February 2024 and the jurisdictional hearing in June, there was not a single report that father had used drugs, consumed alcohol, or was in any way negligent in caring for Allen.  In short, father argues, there was no evidence from which to infer father's behavior would recur.  (Citing *In re M.R.* (2017) 8 Cal.App.5th 101, 109 (*M.R.*).)

However, the juvenile court was entitled to rely on father's past conduct in determining the present risk to Allen.  As in *M.R., supra*, 8 Cal.App.5th at page 109, "the incident that led to the filing of a dependency petition in this case was quite serious."  Also as in *M.R.*, father had not yet completed the parenting program, and father had drug and domestic violence incidents in his past that provided "further reason why the court could

16

justifiably conclude there remained a risk" to Allen. (*Id.* at p. 110.)[5]

Given the severity of the incident and father's substance abuse history, criminal history, and prior involvement with DCFS, the juvenile court was justified in concluding informal supervision was warranted to help mitigate the risk of harm to Allen.

## DISPOSITION

The judgment is affirmed.


CHAVEZ, J.

We concur:


LUI, P. J.                              ASHMANN-GERST, J.

---

[5]     *In re S.F.* (2023) 91 Cal.App.5th 696, cited for the first time in father's reply brief, is distinguishable.  There, the father admitted he used to abuse crack cocaine and alcohol but was about two years sober.  (*Id.* at p. 717.)  The *S.F.* court found the agency presented no evidence father's reported sobriety was false, let alone that any prior or current drug use presented a substantial risk of harm to the minor.  (*Ibid.*)  However, in *S.F.*, the father was a noncustodial parent who was in New York at the time the child came to the attention of the court.  The father did not cause the child to ingest a harmful substance.  Similarly, in *In re Destiny S.* (2012) 210 Cal.App.4th 999, also cited for the first time in father's reply brief, the appealing parent was not the cause of serious harm to the child.  These cases differ from the present matter, where the father's act of giving his newborn baby alcohol created the serious risk of harm to the child.

17